ACCURSO, J.A.D.
*335 *532 The central question in this challenge to the award of the more than six-billion-dollar State contract for pharmacy benefit services is whether the winning bidder's statement
reserv[ing] the right to modify Financial Contracted Terms based on changes by the State in formulary or any carve out of services set forth in the Agreement, including but not limited to Specialty Pharmacy services,
constituted a material deviation from a non-waivable term of the Solicitation for Bids. Although anticipated changes in Plan Design affecting the Contract make the question more difficult than it might otherwise appear, we conclude the bid substantially deviated from a material, non-waivable price term in the Solicitation and thus reverse the decision of the Acting Director of the Division of Purchase and Property and order the Contract rebid.
Incumbent vendor Express Scripts, Inc., challenges the Acting Director's final agency decision sustaining the Division's award of a three-year contract for Pharmacy Benefit Management to OptumRx, Inc., based on its "reasonable cost Quote totaling $6,692,234,901." The award was the result of an innovative, expedited procurement, specifically authorized by legislation designed to permit the State to secure technical assistance to run an online, automated, reverse auction to select a pharmacy benefits manager or PBM to administer the self-insured, prescription drug plans for the approximately 835,000 active employees, retirees and dependents participating in the State Health Benefits Plan (SHBP) and the School Employees' Health Benefits Plan (SEHBP). See L. 2016, c. 67.
The State's Bid Solicitation sought a PBM that could provide *533 "integrated Retail, 90-day Retail,[1] Specialty[2] and Mail Order Drug management" and corresponding pharmacy networks "sufficiently accessible to Plan Members" with the "financial capabilities and contractual arrangements with Participating Pharmacies and Pharmaceutical Manufacturers to support a commitment to deliver quality and lowest net cost pharmacy services." The Solicitation established the State's expectation that the successful bidder be, among other things, "[c]ost effective and transparent by *336 quoting competitive, guaranteed Ingredient Cost Discounts,[3] Administrative Fees[4] and Rebates,[5] practicing effective Pharmacy Benefits *534 Management,[6] and agreeing to be held accountable through Performance Standards and Financial Guarantees."[7]
This expedited procurement had its genesis in the State's efforts to address the health and sustainability of the State's pension and health care benefits programs, specifically L. 2011, c. 78. Chapter 78, among other things, created a Plan Design Committee in both the SHBP and the SEHBP, each made up of an equal number of members appointed by the governor and by the public employee unions with the responsibility for the design of the various health plans offered by each program, including those for prescription drug benefits, with "the authority to create, modify, or terminate any plan or component, at its sole discretion." L. 2011, c. 78, §§ 45 and 46 (amending N.J.S.A. 52:14-17.27 and N.J.S.A. 52:14-17.46.3 ). See also Rosenstein v. State, Dep't of Treasury, Div. of Pensions & Benefits, 438 N.J. Super. 491, 494-95, 105 A.3d 1140 (App. Div. 2014).
Although the Plan Design Committees voted in 2015 and 2016 to approve a variety of health benefit cuts to members in order to reduce the costs of the programs to the State, the SEHBP Committee balked at $250 million in additional concessions sought by the administration in 2016. The union members on the Committee proposed the online automated reverse auction concept for PBM services as an alternative means of capturing savings in the *535 State's prescription drug plans. The unions projected that procuring a new PBM through a reverse auction could save the State as much as $200 million a year. The State projects the annual savings from the contract awarded to Optum will be *337 more than double that amount. Indeed the State contends on the first page of its merits brief that this contract will result "in $1.6 billion in savings to the SHBP and SEHBP over the term of the new [three-year] contract, as compared to the old contract."
The State's prescription drug plans are self-insured, meaning the State pays for all of the drugs as well as the costs of administering the plans. It uses a pharmacy benefits manager to manage the plans and control the State's costs by negotiating with drug manufacturers and wholesalers as well as with a network of retail, mail and specialty pharmacies to provide members the greatest access to effective medications at the most competitive pricing. The online reverse auction concept was proposed as a way to evaluate the projected costs of competing PBM proposals to the State, all of which have different drug and network discount arrangements, in order to achieve savings in drug costs and PBM services instead of through benefit cuts to employees, retirees and their dependents. The Legislation
On November 3, 2016, Senator Sweeney introduced S. 2749 (2016), a bill providing for the expedited procurement of a pharmacy benefits manager, as well as technical assistance to evaluate the qualifications of bidders in that procurement and electronic review of invoiced PBM pharmacy claims. The bill very broadly authorized the Division, "to the extent necessary, to waive or modify any other law or regulation that may interfere with the procurement of these services." S. Budget & Appropriations Comm. Statement to S. 2749 (Nov. 3, 2016).
Eighteen days later, on November 21, 2016, the bill unanimously passed both houses of the Legislature. It was signed by the Governor the same day. L. 2016, c. 67. The law, which took effect immediately, provides in pertinent part:
*536 1. a. Notwithstanding the provisions of any other law to the contrary, a contract for the services of a ... (PBM) for the ... (SHBP) or the ... (SEHBP) shall be procured in an expedited process and in the manner provided by this section.
b. The Division of Purchase and Property in the Department of the Treasury shall procure, without the need for formal advertisement, but through the solicitation of proposals from professional services vendors, from qualified vendors the following three services based upon price and other factors:
(1) technical assistance to the State to evaluate the qualifications of bidders on a PBM procurement and to provide online automated reverse auction services to support the Department of the Treasury in comparing the pricing for the PBM procurement. The technology platform shall, if possible, utilize a re-pricing of PBM proposals for the SHBP and SEHBP pharmacy spending utilizing code-based classification of drugs from nationally-accepted data sources of comparisons of the costs of PBM proposals;
(2) real-time, electronic, line-by-line, claim-by-claim review of invoiced PBM pharmacy claims using an automated claims adjudication technology platform that allows for online comparison of PBM invoices and auditing of other aspects of the services provided by the PBM; and
(3) a PBM and related services.
....
d. The division may, to the extent necessary, waive or modify any other law or regulation that may interfere with the expeditious procurement of these services.
*338 e. "Reverse auction" means an automated bidding process conducted online that starts with an opening price and allows qualified bidders to counter offer a lower price, for as many rounds of bidding as determined by the division.
2. This act shall take effect immediately and shall expire after the award of the next PBM contract.
[Ibid. ]
The PBM Bid Solicitation
On February 15, 2017, the Division's Procurement Bureau issued a bid solicitation in accord with L. 2016, c. 67 for a contractor to provide technical and professional services in procuring a pharmacy benefits manager. Two months later, the Division awarded the contract to Truveris, Inc., which created the reverse auction tool employed in the PBM procurement.
On May 16, 2017, nineteen days after award of the technical service contract, the Procurement Bureau issued the Bid Solicitation for the pharmacy benefits manager, the purpose of which was to award a Master Blanket Purchase Order or Contract, "to that responsible Vendor {Bidder} whose Quote {Proposal}, conforming *537 to this Bid Solicitation {RFP} is most advantageous to the State, price and other factors considered."[8] The Solicitation explained that bidders would participate in an automated reverse auction through the "Reverse Auction Tool which has the capability to project SHBP/SEHBP costs based on the Vendor's {Bidder's} proposed pricing terms." Those pricing terms, specifically, the Administrative Fees, Average Annual Guarantees, Specialty Drug Overall Effective Discount Guarantees, Specialty Drug Minimum Guaranteed Discounts and Rebate Guarantees make up the Financial Contracted Terms that Section 3.7.1A of the Solicitation requires remain in effect for the entire three-year Contract period.
The Bid Solicitation is almost two hundred pages long and includes a myriad of detailed provisions relating to the intricacies of drug pricing and PBM performance standards. We focus only on those provisions directly relevant to the bid dispute.
Section 1.1, "Purpose and Intent," explains the role of the Plan Design Committees created by Chapter 78, as it relates to the PBM procurement. The Solicitation describes them as "responsible for reviewing the SHBP/SEHBP Prescription Drug Plan Designs,[9] and developing any changes therein that are determined to be cost effective and in the mutual best interests of the State, participating Local Employers, employees, retirees, and their Dependents." The discussion concludes by highlighting for bidders that:
the Plan Design Committees may make Plan Design changes during the term of the Blanket P.O. {Contract} that are not contemplated by this Bid Solicitation {RFP}. The State expects that such changes could include, but are not limited to, new eligibility groups, changes in Deductibles, Copayments, Out of Pocket (OOP)
*538 maximums, implementation of new clinical and/or health and productivity programs, and similar variables. In *339 the event of such change, appropriate changes to the Contract shall be made pursuant to Section 5.18 of the Bid Solicitation {RFP}.
[Emphasis is ours.]
Section 5.18 of the Bid Solicitation, "Change in Plan Design," provides:
During the term of the Blanket P.O. {Contract}, the State shall have the right to make any change to any Plan, including, without limitation, changes in Deductibles, Copayments, Plan maximums, and similar variables.
In the event of such a change, the parties shall meet to discuss the change and discuss the needed Change Orders {Contract Amendments} to the Blanket P.O. {Contract}. For any such Change Order {Contract Amendment}, there shall be no change in the Administrative Fee when the Vendor {Contractor} need only make changes in its Claim administration and other related systems, such as changes in Deductible, Copayment, Plan maximum or similar variable. Similarly, there shall be no change in the Administrative Fee for a change in Plan that requires a change to the open enrollment period, a special open or limited enrollment period, additional communications with Network Providers or reissuance of an Identification Card to some or all Members.
If more substantial changes are made to a Plan or Plans, such that the Vendor {Contractor} must make more substantial changes to its systems, or undertake more work than set forth in the prior paragraph, the parties shall engage in negotiations for a change to the Administrative Fee for a period of 30 calendar days. If no agreement is reached at the conclusion of the negotiations period, the change in the Plan Design will be treated as a change in law and addressed pursuant to section 5.5 of the Standard Terms and Conditions.
The State reserves the right to separately procure services from another Vendor(s) {Contractor(s)} where the Plan Design changes involve substantial change to the current Plans or the creation of new Plans.
[Emphasis in original.]
Change Orders for amendments to the Contract are controlled by Section 5.4 of the Bid Solicitation, "Change Order {Contract Amendment}," which provides that "[a]ny changes or modifications to the terms of this Blanket P.O. {Contract} shall be valid only when they have been reduced to writing and signed by the Vendor {Contractor} and the Director." Section 5.5 of the Standard Terms and Conditions,[10] "Change in Law," provides:
*539 Whenever a change in applicable law or regulation affects the scope of work, the Director shall provide written notice to the contractor of the change and the Director's determination as to the corresponding adjusted change in the scope of work and corresponding adjusted contract price. Within five (5) business days of receipt of such written notice, if either is applicable:
A. If the contractor does not agree with the adjusted contract price, the contractor shall submit to the Director any additional information that the contractor believes impacts the adjusted contract price with a request that the Director reconsider the adjusted contract price. The Director shall make a prompt decision taking all such information into account, and *340 shall notify the contractor of the final adjusted contract price; and
B. If the contractor has undertaken any work effort ... that is being changed or eliminated such that it would not be compensated under the adjusted contract, the contractor shall be compensated for such work effort according to the applicable portions of its price schedule and the contractor shall submit to the Director an itemization of the work effort .... The Director shall make a prompt decision taking all such information into account, and shall notify the contractor of the compensation to be paid for such work effort.
Reading Sections 5.18 (Change in Plan Design) and 5.4 (Change Order) of the Bid Solicitation in conjunction with Section 5.5 (Change in Law) of the Standard Terms and Conditions makes the following points clear.
First, the State reserved unto itself the right to make any change to the design of its prescription drug plans during the term of the Contract, and, in the case of substantial change to the plans or creation of new plans, to separately secure services from another Vendor.
Second, although the parties must meet to discuss any changes the State makes to its plans during the term of the Contract, and any needed Change Orders that might flow from them, no Change Order will become effective until reduced to writing and signed by both parties.
Third, there will be no change to the Administrative Fee, that is, the "all-inclusive monthly fee" for PBM services, which "multiplied by the number of participating public employees/retirees" makes up the Vendor's "monthly compensation," when Plan Design changes require only changes in the Vendor's claim administration and related systems or a change to an open enrollment *540 period or additional communications with Network Providers or reissuance of Identification Cards to members.
And fourth, although the parties will engage in negotiations for a change to the Administrative Fee for plan changes requiring additional work or more substantial changes to the Vendor's systems, the Director ultimately decides whether the Administrative Fee is to be adjusted and, if so, by how much.
Although not addressed in Section 5.18 governing Plan Design changes, there is another provision of the Solicitation addressing the effect of Plan Design changes on pricing. Section 4.4.5.2 of the Bid Solicitation, "Price Sheet/Schedule Attachment Instructions," in Section 4, "Quote {Proposal} Preparation and Submission," provides in part that:
The PBM shall not make any modification or adjustment to the pricing set forth herein without the prior written consent of the State, except as follows:
A. Upon a Plan Design change enacted by the State; and
B. Such Plan Design change has a material negative impact on Rebates earned (i.e., a ten percent (10%) or greater reduction in Rebates earned) (collectively, a "Pricing Adjustment Trigger"). If a Pricing Adjustment Trigger occurs, any adjustment shall be limited to an adjustment that is solely necessary to return PBM to its contracted economic position prior to the State making the Plan Design change that resulted in the Pricing Adjustment Trigger.
Thus, in contrast to the Solicitation's treatment of substantial Plan Design changes on adjustment of the Administrative Fee, which it leaves in the hands of the Director, changes resulting in a ten percent or greater reduction in the PBM's *341 earned Rebates result in an automatic adjustment under the Solicitation to return the parties to their contracted economic positions. We note that besides the lack of any reference to Section 4.4.5.2 in Section 5.18, neither "Rebates earned" nor "Price Adjustment Trigger" is a defined term in the Bid Solicitation.
Further, Section 4.4.5.2 appears to conflict with Section 5.4, governing amendments to the Contract, as it permits a modification or adjustment of the Financial Contracted Terms without a writing signed by the parties. If so, Section 5.1 of the Bid Solicitation, "Precedence of Special Contractual Terms and Condi tions *541 ," provides that Section 5 rather than Section 4 controls interpretation. As neither the Acting Director in his decision nor any of the parties in their briefs to this court relied on Section 4.4.5.2 or even called it to our attention in the context of a Plan Design change, we do not have the benefit of their interpretation of this provision or its significance for the Contract.
The parties agree, however, that Rebates, and not Administrative Fees, are one of the largest drivers of PBM pricing, which makes this critical provision's placement in a section of the Solicitation instructing bidders on how to fill out their pricing proposals, and the State's failure to include or even reference it in Section 5.18, perplexing. The PBM's main sources of profit are its retention of a portion of any manufacturer Rebates it receives for Specialty and Brand Drugs, its revenue from negotiated discounts and its generic pricing spreads, all of which are included in the Vendor's guaranteed pricing, which, along with the Administrative Fee, make up the Financial Contracted Terms[11] it is obligated to keep "in effect for the entire Blanket P.O. {Contract} period" pursuant to Section 3.7.1 of the Bid Solicitation.
If we attempt to read Sections 4.4.5.2, 5.18 and 5.4 of the Bid Solicitation in conjunction with Section 5.5 of the Standard Terms and Conditions as we would any contract, "as a whole, without artificial emphasis on one section, with a consequent disregard for others," Borough of Princeton v. Bd. of Chosen Freeholders of the Cty. of Mercer, 333 N.J. Super. 310, 325, 755 A.2d 637 (App. Div. 2000), aff'd, 169 N.J. 135, 777 A.2d 19 (2001), it would appear the PBM Contract is designed to limit the Vendor's ability to change its pricing in response to Plan Design changes to those situations in which the change has a "substantial" impact on the Vendor's systems or a "material negative impact" on its pricing. That is, no change is permitted to the Administrative Fee for "insubstantial"
*542 changes to the Plans pursuant to Section 5.18 and, change to the other pricing components is permitted under Section 4.4.5.2 only if the design change has resulted in at least a ten percent reduction in Rebates earned. The difference being that the State ultimately controls any adjustment in the Administrative Fee under Section 5.18, while Section 4.4.5.2 permits an automatic adjustment without consent of the State once a Pricing Adjustment Trigger has occurred.
The Questions and Answers
Pursuant to the power provided by the Legislature to expedite the procurement, the Division allotted only a one week period for questions from potential bidders about the terms of the Solicitation, during which it received 182 questions. Four of those questions related to Section 5.18, at least one of which, question 174, was from *342 Optum. Those questions and the answers provided by the Procurement Bureau on May 30, 2017, are as follows:
*543 # Page RFP Section Question (Bolded) and Answer # Reference 115 127 Section Can DPB [Division of Pensions and 5.18 (Change Benefits] provide historical information in Plan on the frequency of Plan Design changes Design) and, of such changes, how frequently have they been significant enough to justify a change in the Administrative Fee? Historically, Plan Design changes have generally occurred on an annual basis. They have rarely been significant enough to justify a change in the Administrative Fee. 116 128 Section In the PBM industry, some changes made 5.18 (Change by clients such as DPB only affect a in Plan handful of medications but could have Design) large impacts on rebates. For example, if DPB decided to exclude all brand medications in a certain therapeutic category which were heavily rebated, rebate guarantees would need to be modified. Can the State confirm that in a situation like described here, the State would engage in negotiations on an item like rebate guarantees? The State acknowledges that Plan Design changes that exclude certain Brand Drugs will impact Rebate Guarantees. It is expected that the Contractor and the State would discuss any needed amendments to any Financial Guarantees prior to any Plan Design change. 117 128 Section In addition to plan design changes, 5.18 (Change regulatory changes or marketplace events in Plan could impact the PBM's ability to *343 *544 Design) achieve the guarantees. Will the State agree, subject to the PBM's obligation to provide an appropriate justification for any change, that in such a case, pricing terms may be negotiated if a regulatory change or marketplace event has such an impact? Please refer to RFP Section 3.7.1 (H) and Section 5.5 of the New Jersey Standard Terms and Conditions. 174 127 Section Will the State consider adding the 5.18 (Change following provision: Vendor may change in Plan the pricing (a) any time State-initiated Design) changes are made to the plan specifications, including the benefit plan, formulary, network, or a utilization management program, that adversely impact Vendor's compensation, cost to provide services or ability to satisfy a guarantee under this Agreement; (b) when there are changes in laws or regulations; (c) when the State asks and Vendor agrees to perform any service in addition to the Services; Vendor will provide DPB with notice 30 days prior to implementation of the change describing the change. The State does not agree to this modification. See "T2679 PBM Revised RFP 53017".
The Bureau incorporated its answers to all of the questions asked by potential bidders into the final Solicitation for Bids in Bid Amendment Addendum No. 2.
The four questions directed to Section 5.18 reveal a concern by potential bidders about the effect of Plan Design changes on their pricing beyond the Administrative Fee, including but not limited to, their ability to satisfy Rebate Guarantees, defined in the Bid Solicitation as "[t]he amount of Rebates that the Vendor {Contractor} guarantees will be paid to the [Division of Pensions and Benefits]." In response to those concerns, the State flatly rejected Optum's request in question 174 that the State modify the Contract terms to permit the Vendor to "change the pricing" whenever the State makes changes to "the plan specifications, including *545 the benefit plan, formulary, network, or a utilization program"[12] that would "adversely impact Vendor's compensation, cost to provide services or ability to satisfy a guarantee under this Agreement." *344 The State acknowledged in response to question 116 "that Plan Design changes that exclude certain Brand Drugs will impact Rebate Guarantees."[13] Echoing its statement in Section 5.18 that in the event of a Plan Design change, "the parties shall meet to discuss the change and discuss the needed Change Orders," the State expressed its expectation that in the event it excluded certain Brand Drugs from the Formulary, it "would discuss any needed amendments to any Financial Guarantees," that is, the "Financial Contracted Terms" of the Contract, minus the Administrative Fee, with the Vendor "prior to any Plan Design change." The State did not, however, refer potential bidders to Section 4.4.5.2.[14] The Division's answers to the questions posed by potential bidders regarding Section 5.18 made clear it refused to make any modifications to the Section governing Plan Design changes and Section 5.18 remained unchanged in the final revised RFP.
The State's responses to two questions posed by potential bidders regarding the scope of work as it relates to Specialty Pharmacy are also important to this controversy.
*345 *546 # Page RFP Section Question (Bolded) and Answer # Reference 29 35 Section 3.1.4 The RFP allows the State to make (Specialty changes to which Specialty drugs Pharmacy)[15] shall be dispensed through the retail network versus a mail Specialty pharmacy, and to change the coverage of existing Specialty Products. Given that the mix of products being dispensed at the mail Specialty pharmacy will impact the overall effective discount that is achieved, please confirm that should adjustments be made to which products are dispensed, and/or where they are dispensed from, that the PBM and the State will work together to adjust the pricing guarantees, if necessary, to ensure the financial terms of the Contract are preserved. In the event that the State chooses to carve out certain Specialty Drugs to allow dispensing at a Retail Pharmacy, the State and the Vendor {Contractor} shall work together so that the existing financial terms of the Blanket P.O. {Contract} are preserved. 144 35 Section Please confirm that in the event 3.1.4C (Scope of that the State chooses to carve out Work, Specialty certain Specialty Drugs to allow Pharmacy) dispensing at a Retail Pharmacy, the State and the Contractor shall work together so that the existing economic positions of the parties are preserved. In the event that the State chooses to carve out certain Specialty Drugs to allow dispensing at a Retail Pharmacy, the State and the Vendor {Contractor} shall work together so that the existing financial terms of the Blanket P.O. {Contract} are preserved.
[Editor's Note: The preceding image contains the reference for footnote[15] ].
*547 Although the State committed itself in response to those two questions to *346 working with the Vendor to preserve the financial terms of the Contract in the event the State "carve[s] out certain Specialty Drugs to allow dispensing at a Retail Pharmacy," it expressly refused in response to another question to modify Section 5.4 of the State Standard Terms and Conditions "State's Option to Reduce Scope of Work,"[16] which permits the State "in its sole discretion" to reduce the scope of work and assign a corresponding adjusted contract price.
Specifically, the State refused a potential bidder's request to delete the last sentence of Section 5.4A, which provides "[i]f the parties are unable to agree on an adjusted contract price, the *548 Director shall make a prompt decision taking all such information into account, and shall notify the contractor of the final adjusted contract price." See the State's response to Question 177. Accordingly, taking all three answers into account, should the State choose to carve out certain Specialty Drugs for dispensing at a Retail Pharmacy, the parties will work together to preserve the existing financial terms of the Contract but, pursuant to Section 5.4 of the State Standard Terms, it will be the Director who ultimately decides the adjustment necessary.
Submission of Proposals
On the June 12, 2017 proposal submission date, the Division received proposals from Express Scripts, Optum and Caremark PCS Health, LLC. Optum's proposal included the following statement at the center of this appeal:
OptumRx accepts all terms and conditions of this bid with the following additional language:
? Section 5.18-Agree, as it applies to changes that impact administrative fees as outlined in this provision, provided that Vendor reserves the right to modify Financial Contracted Terms based on changes by the State in formulary or any carve out of services set forth in the Agreement, including but not limited to Specialty Pharmacy services.
The Evaluation Committee, comprised of representatives from the Division of Pensions and Benefits, the New Jersey Education Association and the Procurement Bureau, evaluated each proposal against the requirements of the RFP. Finding that "all Bidders submitted proposals *347 which conformed to the requests and requirements of the RFP," the Committee pre-qualified all three bidders to participate in the Reverse Auction. As explained by the Acting Director, "[f]ollowing prequalification, price was the only factor to consider as the purpose of a Reverse Auction is to benefit from the bidders reducing their pricing over rounds [of] bidding."
Following a mandatory training in the use of the "TruBid" Reverse Auction Tool, all three bidders participated in the first round auction from June 14 to 19, 2017, by submitting their proposed pricing for Administrative Fees, Ingredient Cost Discount Guarantees and Rebate Guarantees using Truveris' automated *549 online software program. Using 2016 actual claims data submitted by the State, Truveris applied a set of trend assumptions based on historic utilization of generic, brand and specialty drugs in the SHBP/SEHBP and an inflation forecast for each drug classification to re-price a sample set of claims in order to create a three-year forecast of SHBP/SEHBP prescription drug costs to the State based on each bidder's price terms. Following the first round, Express Scripts was the low bidder, with a projected price of $6,806,207,205.
For the second round, conducted from June 22 to 25, 2017, Truveris updated its baseline estimates by applying 2017 contract extension discounts and rebates to the 2016 claims and the bidders updated their price proposals. After tabulating the results of the second round, Optum was declared the low bidder, with a projected price of $6,692,234,901. Express Scripts had the highest bid of the second round, with a projected price of $6,780,344,652. Truveris characterized the bid by Express Scripts as having "[i]mproved slightly" in the second round "with all improvements coming from increased rebate guarantees," in contrast to Optum's bid, which Truveris concluded made "[s]ignificant improvements coming from both improved ingredient cost discounts and improved rebates."
The Bid Protest
Based on the unanimous vote of the Evaluation Committee, the Division of Purchase and Property on June 29, 2017, announced its intent to award the Contract to Optum, and that the protest period would end the following morning at 9:00 a.m. Express Scripts objected, noting "the vendors have received nothing more than a bar chart indicating the relative position of the bidders after round two," and arguing it was "patently unreasonable to shorten the protest period to less than a 24-hour period in a multi-billion dollar procurement." The Division denied Express Scripts' request to extend the protest period, relying on the ability granted it by the Legislature in Chapter 67 "to the extent necessary, [to] waive or modify any other law or regulation that may interfere with the expeditious procurement of these services," and noting it *550 was "in the process of providing" counsel with the documents requested.
After receiving "over 650 pages of materials" from the Division "[b]etween approximately 9:00 and 9:30 a.m. on June 30," Express Scripts filed its bid protest by the Division's extended noon deadline, requesting a stay of the Contract award and the right to supplement its protest upon receipt of documents still not provided. The Acting Director of the Division issued a final decision the same day sustaining the Division's decision to award the contract to Optum and denying Express Scripts' request for a stay.
Thereafter, Express Scripts sought additional documents, including the forms submitted by the bidders. On July 5, 2017, the Division provided Express Scripts with that information as well as an outline of *348 the trend assumptions Truveris used in the Reverse Auction Tool. That same day, Express Scripts filed an application for permission to file an emergent motion with this court, which it withdrew after the Division granted it the opportunity to file a supplemental bid protest.
The following day, Express Scripts filed a supplemental bid protest and renewed its request for a stay of the Contract award, asserting three reasons Optum's bid should have been rejected: 1) Optum took a material exception to Section 5.18 "by unilaterally reserving the right to adjust the Financial Contracted Terms," 2) the State failed to confirm that Optum "had the mandated Security, Disaster Recovery and Contingency Plans," and 3) the State's "calculation of estimated bid price was apparently based on undisclosed pricing figures" and the assumptions the State did disclose "appear[ed] inaccurate." The next day, July 7, 2017, the Acting Director issued a supplemental final agency decision rejecting Express Scripts' bid protest, sustaining the Division's notice of intent to award the contract to Optum and denying the request for a stay. The Acting Director found Optum's proposal was "responsive to the requirements of the RFP and there is no material deviation."
*551 The Acting Director's Final Decision
Turning first to Express Scripts' claim that Optum's reservation of the right to modify the Financial Contracted Terms was a material deviation from Section 5.18, the Acting Director explained that all potential bidders were put on notice by the Division's answers to the four questions relating to Section 5.18,
that [the] State fully expects to negotiate all pricing and financial guarantees prior to the implementation of any plan design changes. Specifically, the State rejected [Optum's] proposed modification to the RFP which would permit a Contractor to change pricing any time there is State initiated change to the plan specifications, including the benefit plan, formulary, network etc.
The Acting Director thus concluded that "Optum's proposed reservation [in its proposal] was addressed and rejected during the Questions and Answer Period."
The Director went on to explain that "[i]mportantly, the RFP addresses the situation where a Bidder's proposed language may not conform to the specified requirements of the solicitation." Relying on Bid Specification Section 4.0, "Quote {Proposal} Preparation and Submission," the Director noted "the RFP advises Bidders that if a proposed term or condition conflicts with the RFP, or diminishes the State's rights under any Contract, that term will be considered null and void." Section 4.1, as quoted by the Director, provides in part:
Quotes {Proposals} including Vendor {Bidder} proposed terms and conditions may be accepted, but Vendor {Bidder} proposed terms or conditions that conflict with those contained in the Bid Solicitation {RFP} as defined in Section 2.0 of this Bid Solicitation {RFP}, or that diminish the State's rights under any Blanket P.O. {Contract} resulting from the Bid Solicitation {RFP}, will be considered null and void. The State is not responsible for identifying conflicting Vendor {Bidder} proposed terms and conditions before issuing a Blanket P.O. {Contract} award. It is incumbent upon the Vendor {Bidder} to identify and remove its conflicting proposed terms and conditions prior to Quote {Proposal} submission. In the event that a Vendor {Bidder} intends to propose terms and conditions contrary to the Bid Solicitation {RFP}, these Vendor {Bidder} proposed terms and conditions shall only be considered if submitted *349 pursuant to the procedure set forth in Section 1.3.1 of this Bid Solicitation {RFP}. Vendors {Bidders} shall not submit exceptions on the "Terms and Conditions" Tab through NJSTART. Under no circumstance is the State required to accept a Vendor's {Bidder's} exception to the Bid Solicitation {RFP}. *552 In the event that prior to Notice of Intent to Award, the Division notifies the Vendor {Bidder} of any such conflicting Vendor {Bidder} proposed term or condition and the conflict it poses, the Division may require the Vendor {Bidder} to either withdraw it or withdraw its Quote {Proposal}.
After award of Blanket P.O. {Contract}:
A. if conflict arises between a Vendor {Bidder} proposed term or condition included in the Quote {Proposal} and a term or condition of Bid Solicitation {RFP}, the term or condition of the Bid Solicitation {RFP} will prevail; and
B. if the result of the application of a Vendor {Bidder} proposed term or condition included in the Quote {Proposal} would diminish the State's rights, the Vendor {Bidder} proposed term or condition will be considered null and void.
[Emphasis is the Acting Director's.]
Thus relying on Section 4.1, the Acting Director concluded "[h]ere, to the extent that Optum's proposed reservation in response to RFP § 5.18 conflicts with a term of the RFP, the RFP terms prevail."
The Acting Director further found, based on the order of precedence set forth in Section 5.1, "Precedence of Special Contractual Terms and Conditions,"[17] that "the RFP, as amended by Bid Amendment[,] prevail[s] over ... Optum's submitted technical proposal." Addressing the materiality of the deviation, the Acting *553 Director concluded that "Optum did not have an advantage over other Bidders by taking an exception to the mandatory terms of the RFP as those terms are not entitled to any effect. As such, there is no material deviation."
The Acting Director also rejected Express Script's claim that the State failed to confirm Optum had complied with Section 3.12, which requires that "[t]he Vendor {Contractor} must provide a detailed system design document showing Security Plan, Disaster Recovery Plan, Contingency Plan and Backup Plan." The Director began his analysis by noting the difference between Section 3.12, which applies to the "Vendor {Contractor}," that is, "the Vendor {Bidder} awarded a Blanket P.O. {Contract} resulting from this Bid Solicitation *350 {RFP}," and Section 4.4.3.3.4, "Plans Required by Bid Solicitation {RFP} Section 3.12," which requires only that "[t]he Vendor {Bidder} shall provide its draft plans required by Section 3.12." (Emphasis is the Acting Director's.) Section 4.4.3.3.4 further provides "[t]he plans should demonstrate to the Evaluation Committee that the Vendor {Bidder} understands the scope of work required for a successful implementation of the system, its operations and maintenance and support."
The Acting Director further noted that during the question and answer period, a potential bidder asked, and the State agreed, that bidders could opt to have their draft plans available for review at their own facilities, instead of submitting them, "[d]ue to the highly sensitive nature" of disaster recovery and contingency plans. That question and the Division's response was incorporated into Addendum No. 2.
In its proposal, Optum addressed the security plan required by Sections 3.12 and 4.4.3.3.4 as follows:
SECURITY PLAN AS DESCRIBED IN SECTION 3.12.1
As allowed in the questions and answers provided to question 100 on May 30, 2017, we have responded with the following:
Due to the sensitive nature of the information, our complete business continuity and disaster recovery plans are considered proprietary and confidential. For audit purposes, the plans may be viewed in a controlled environment with UnitedHealth Group subject matter experts available to answer questions. The plans may not be *554 copied or removed after the meeting. This policy is in place to protect not only UnitedHealth Group operations and employees, but also the security, integrity, and confidentiality of protected information.
Optum addressed its disaster recovery and contingency plans in identical fashion, only adding:
An overview document is available, which describes the governance, strategy, and controls for the entire program. This document is not intended to replace the business continuity or disaster recovery plan review, but does provide the reassurance that UnitedHealth Group has a well-defined program in place to verify customer impact is minimized during a disaster.
Proprietary and Confidential[.]
The Acting Director found that "while Optum may not have included a detailed security plan within its Proposal, it did include a 'Data Storage and Tape Management Overview' document," in which it "discussed the steps taken to ensure security, data protection, other controls, data center facilities, and encryption." He explained Optum marked that document as "confidential and proprietary information," and "it was redacted in whole at Optum's request in accordance with N.J.S.A. 47:1A-1."
The Acting Director thus noted that "while the document was not produced to [Express Scripts], it was reviewed by the Evaluation Committee during its prequalification review of Optum's Proposal. The Committee concluded that the information disclosed demonstrated that Optum understood the security requirements of the RFP required for a successful implementation of the system." As a result, the Acting Director found that "[c]ontrary to [Express Scripts'] assertion, Optum complied with the RFP requirement that the Bidder submit a draft plan that demonstrates to the Committee that the Bidder understands the scope of work required for a successful implementation of the system, *351 its operations and maintenance and support," and thus "there was no deviation from the requirements of the RFP." (Emphasis is the Acting Director's.)
The Acting Director rejected as untimely Express Scripts' claim relating to the price assumptions Truveris applied in the Reverse Auction Tool, concluding that any protest relating to "the assumptions and methodology used in the Reverse Auction Tool" "should *555 have been filed in connection with or in response to Solicitation # 17DPP00106" awarded to Truveris in April 2017. Further, the Acting Director noted "Truveris implemented the following assumptions provided by the [Division of Pensions and Benefits] into the Reverse Auction Tool:
Generic Utilization: 1.5%
Brand Utilization: 1.5%
Specialty Utilization: 8%
Generic Inflation: 2.7%
Brand Inflation: 12%
Specialty Inflation: 13%."
The Acting Director maintained that "[t]hese assumptions were the only assumptions utilized in the Reverse Auction Tool" and that they were "applied to all Bidders' inputted data. All other data, specialty, brand, generic classifications, utilized by the Reverse Auction Tool in projecting the proposed proposal pricing was input by the Bidder." He further noted, however, that:
While the assumptions utilized in the Reverse Auction Tool were in place prior to proposal submission and remained consistent throughout the two rounds of proposal price submission by the Bidders, in an effort to prevent Bidders from skewing their inputted data, and to ensure that the State received the most accurate information resulting [in] the best offer, the above assumptions were not provided to Bidders prior to proposal submission.
He found that because "[t]he evaluation methodology and the assumptions remained consistent throughout the evaluation process and throughout the two rounds of proposal price submission. ... neither Truveris nor the Bureau had the ability to manipulate the data to skew the respective position of the Bidders."
The Acting Director concluded:
Finally, simply because [Express Scripts] disagrees with the results of the Reverse Auction is no reason to set aside the Contract Award to Optum. ... The assumptions utilized in the Reverse Auction Tool did not result in a skewing of the respective Bidders nor did it result in an inaccurate depiction of the Bidders' proposals compared to one another as the assumptions applied to all of the Bidders.
He further noted that "even if there were errors in the assumptions used by Truveris to create the Reverse Auction Tool, those assumptions affect all Bidders, such that all Bidders remained on a level playing field," and "even without utilizing these assumptions,"
*556 Express Scripts' proposal price was higher than both Caremark's and Optum's.
The Acting Director also analyzed and rejected Express Scripts' request for a stay of the contract award to preserve the status quo applying the Crowe [18] factors. Acknowledging the well-settled right of a disappointed bidder to seek a stay of the contract award, M. A. Stephen Constr. Co. v. Rumson, 125 N.J. Super. 67, 74, 308 A.2d 380 (App. Div. 1973), he found Express Scripts would not suffer irreparable harm if the stay were denied, notwithstanding that "monetary damages are never *352 available for the failure to award a public Contract," see Commercial Cleaning Corp. v. Sullivan, 47 N.J. 539, 546, 222 A.2d 4 (1966). Relying on our opinion in Waste Management of New Jersey, Inc. v. Union County Utilities Authority, 399 N.J. Super. 508, 520, 945 A.2d 73 (App. Div. 2008), in which we noted that "in some cases, such as when the public interest is greatly affected, a court may withhold relief despite a substantial showing of irreparable injury to the applicant," the Acting Director concluded the "more than $1.6 billion in savings" "the award of this Contract will bring about," meant the public interest did not favor staying the Contract award.
Having found Express Scripts could not demonstrate a reasonable likelihood of success on the merits for the reasons we recounted, the Acting Director concluded the balance of the equities was decidedly in favor of the State. Explaining that "[f]ailure to award the new Contract by June 30, 2017" would prevent Optum from doing everything necessary "to ensure that it can handle open enrollment of members in October 2017" thereby jeopardizing "the $1.6 billion in savings over the life of the new Contract," the Acting Director concluded "[t]he State's and the public's interest in moving forward with the protest period, in order to satisfy the public purposes of the procurement, outweighs any of [Express Scripts'] legally cognizable interests."
*557 Express Scripts' appeal and request for stay
Express Scripts filed its appeal from the Acting Director's decision the day after it was issued and followed up with an emergent motion for a stay pending appeal. We denied that motion two days after it was filed, finding no likelihood of success on the merits. We did, however, grant Express Scripts' subsequent motion to accelerate our consideration of the appeal.
Once the merits panel began its review in December, we found the appeal presented a closer question than we originally perceived. Oral argument on December 18, although helpful in understanding some of the complexities of the bid pricing, did not assuage our concern that Optum may have been awarded the Contract despite a material deviation in its bid. Although Express Scripts had not renewed its motion for stay, our reassessment of its likelihood of success on the merits and the looming January 1, 2018 Contract start date led us to conclude a stay was "necessary in order to permit the court to consider appellant's challenge to the bid award without the risk of disruption we [had] avoided previously." Accordingly, on December 21, 2017, we entered, sua sponte, an order staying the Optum takeover scheduled for January 1.
The State immediately moved for emergent reconsideration, arguing a stay would result in "extreme disruption" owing to the active State employees bi-weekly pay group scheduled to switch over to Optum for their pharmacy benefits at midnight on Saturday December 23, in advance of the Contract start date, and the Centers for Medicare and Medicaid Services having already "automatically terminated all SHBP/SEHBP Members from the [Express Scripts] Employer Group Waiver Plan," which "could cause Medicare-eligible Members to have no Part D prescription drug coverage because Medicare has now approved the Optum plan."
We entered an order on December 22, scheduling oral argument on the State's motion for reconsideration on December 26, but did not modify the stay. On December 23, Justice LaVecchia denied the State's request to file an emergent application in the Supreme *558 Court in light of our having scheduled argument on the motion, *353 but ordered the Clerk of the Court to forward to the panel the papers submitted to the Court on the emergent application "especially as those papers address the applicants' claims of potential harm to new enrollee members," i.e., those new members who enrolled with Optum during the October 2017 open enrollment who were not previously enrolled with Express Scripts.
On December 24, the State and Optum advised us that despite our stay order and the Supreme Court having denied interim relief, Optum commenced performance as scheduled at midnight on December 23. After reviewing the parties' supplemental filings and hearing argument on December 26, we granted the State's motion for reconsideration and vacated our December 21 stay order. We did so in recognition of the "significant, substantial steps in performance of the awarded contract" taken by the State and Optum, but without "condoning the[ir] conduct" in commencing performance under the Contract, "which was not consistent with the spirit of the stay we issued."
We further made clear the "order should not be interpreted as a reflection of the panel's ultimate consideration of the merits of [Express Scripts'] appeal." On December 27, the Court advised it would consider Express Scripts' motion for stay at its conference on January 9, 2018. The Court denied the motion on January 12 without opinion.
The standards governing our review
Because this dispute arises in the context of a publicly bid contract, we approach the task of reviewing the Acting Director's decision rejecting Express Script's bid protest mindful that the
[b]idding statutes are for the benefit of the taxpayers and are construed as nearly as possible with sole reference to the public good. Their objects are to guard against favoritism, improvidence, extravagance and corruption; their aim is to secure for the public the benefits of unfettered competition. To achieve these purposes all bidding practices which are capable of being used to further corrupt ends or which are likely to affect adversely the bidding process are prohibited, and all awards made or contracts entered into where any such practice may have *559 played a part, will be set aside. This is so even though it is evident that in fact there was no corruption or any actual adverse effect upon the bidding process.
[ Keyes Martin & Co. v. Dir., Div. of Purchase & Prop., Dep't of Treasury, 99 N.J. 244, 256, 491 A.2d 1236 (1985) (quoting Terminal Constr. Corp. v. Atl. Cty. Sewerage Auth., 67 N.J. 403, 409-10, 341 A.2d 327 (1975) ).]
The principles that control our review are well settled. The issue here being whether Optum's bid conformed to the solicitation for bids, the Acting Director's decision is "tested by the ordinary standards governing administrative action," notwithstanding the broad grant of discretion permitted him by N.J.S.A. 52:34-12(a)(g) to select among responsive bids the "most advantageous to the State, price and other factors considered." Matter of Protest of Award of On-Line Games Prod. & Operation Servs. Contract, Bid No. 95-X-20175, 279 N.J. Super. 566, 593, 653 A.2d 1145 (App. Div. 1995). Accordingly, we may not upset the Acting Director's determination absent a showing it violated express or implied legislative policies, lacked substantial evidence to support the findings or could not reasonably have been made applying the legislative policies to the facts. In re Carter, 191 N.J. 474, 482, 924 A.2d 525 (2007) ; Campbell v. Dep't of Civil Serv., 39 N.J. 556, 562, 189 A.2d 712 (1963).
*354 As the Supreme Court has explained, the discretion accorded the Director of the Division of Purchase and Property to administer the State public bidding process, while broad, is not limitless. "In line with the policy goal of thwarting favoritism, improvidence, extravagance, and corruption, the Division may not award a contract to a bidder whose proposal deviates materially from the RFP's requirements." Barrick v. State, 218 N.J. 247, 258-59, 94 A.3d 895 (2014). As Justice LaVecchia wrote in Barrick:
Deviations from material specifications risk transgressing the duty to avoid favoritism, corruption, and the like. Requiring adherence to material specifications maintains a level playing field for all bidders competing for a public contract. Thus, requirements that are material to an RFP are non-waivable; the winning bidder's proposal must comply with all material specifications.
[ Id. at 259, 94 A.3d 895.]
The test for determining whether the Acting Director's decision is consonant with the legislative policies underlying the *560 public bidding laws is the one devised by Judge Pressler in Township of River Vale v. R. J. Construction Co., 127 N.J. Super. 207, 216, 316 A.2d 737 (Law Div. 1974), adopted by the Supreme Court in Meadowbrook Carting Co. v. Borough of Island Heights, 138 N.J. 307, 315, 650 A.2d 748 (1994). The preliminary inquiry is, of course, whether the bid actually deviated from the solicitation for bids. River Vale, 127 N.J. Super. at 215-16, 316 A.2d 737 (acknowledging that while the legislative policy underlying the public bidding laws "dictates that only bids which comply with the specifications and instructions are acceptable, it also dictates, lest the primary purpose of achieving economy be unnecessarily frustrated, that minor irregularities and immaterial variances in the form of the bid not be permitted to result in its invalidation").
If there is a deviation between a bidder's proposal and the solicitation for bids, we apply two criteria to determine
whether [the] specific noncompliance constitutes a substantial and hence nonwaivable irregularity-first, whether the effect of a waiver would be to deprive the municipality of its assurance that the contract will be entered into, performed and guaranteed according to its specified requirements, and second, whether it is of such a nature that its waiver would adversely affect competitive bidding by placing a bidder in a position of advantage over other bidders or by otherwise undermining the necessary common standard of competition.
[ Id. at 216, 316 A.2d 737.]
Our analysis
Applying those standards here provides us no basis to overturn the Acting Director's rejection of the second and third grounds for Express Scripts' protest relating to Optum's security plan and the assumptions incorporated into the Reverse Auction Tool. His decision that Optum fully complied with the RFP's requirement for submission of a draft plan demonstrating the Bidder's understanding of the scope of work required for a successful implementation of the system, its operations, maintenance and support is supported by the record.[19] See *355 *561 Barrick, 218 N.J. at 260, 94 A.3d 895. Although we disagree with the Acting Director's decision that Express Scripts' challenge to the assumptions included in the Truveris Reverse Auction Tool could be considered untimely, given such assumptions were not disclosed to the bidders until after bid opening, there is sufficient evidence in the record that those assumptions were in place and remained constant through both rounds of bidding. Express Scripts' argument that the State may have underestimated the costs the State will pay for PBM services based on flaws in its trend assumptions requires substituting its judgment for the Division's and provides no basis for a challenge to the award. See Commercial Cleaning, 47 N.J. at 549, 222 A.2d 4 (admonishing that "courts should not and cannot substitute their discretion for that of the Director").
We come to a different conclusion, however, with regard to the Acting Director's assessment of Express Scripts' chief complaint, that Optum took a material exception to Section 5.18 by "reserv[ing] the right to modify Financial Contracted Terms based on changes by the State in formulary or any carve out of services set forth in the Agreement, including but not limited to Specialty Pharmacy services."
The Acting Director concluded that language, which he characterized as a "proposed reservation in response to RFP § 5.18" "was addressed and rejected during the Question and Answer period" and, in any event, could not have provided Optum an advantage over other bidders because it was "not entitled to any effect" under Sections 4.1 and 5.1 of the Bid Solicitation. In other words, because Section 4.1 advised bidders that "proposed terms or conditions that conflict with those contained in the Bid Solicitation ... or that diminish the State's rights" under the Contract *562 "will be considered null and void," and Section 5.1 ranks the Bid Solicitation higher than a bidder's quote in "the order of precedence for ... interpretation" of the Contract, the Acting Director determined he could simply dismiss Optum's express reservation as meaningless, thereby obviating any analysis under River Vale.
That was clear error. The Director is never free to accept a bid containing a material deviation from the terms of the solicitation for bids. Barrick, 218 N.J. at 259, 94 A.3d 895. Section 6.1 of the Bid Solicitation, "Right to Waive," acknowledges that rule.[20] Nor is he free to sidestep a bid conformity analysis by simply declaring the alleged nonconformity to be of no effect under the terms of the RFP. On-Line Games, 279 N.J. Super. at 602-03, 653 A.2d 1145. He must evaluate the claimed deviation under a River Vale analysis. Ibid.; see also Weidner v. Tully Envtl., Inc., 372 N.J. Super. 315, 324, 858 A.2d 560 (App. Div. 2004) (explaining in the context of a municipal bid that "[d]espite the RFP's invitation to make changes to the Agreement, it remains incumbent upon the contracting entity to determine if those modifications render the proposal nonconforming").
Thus we reject, out of hand, the State's first line of defense of the Director's decision that "[b]ecause Optum's *356 proposed exception to RFP § 5.18 was automatically invalidated by the Addendum # 2 [rejecting "the proposed modification to the RFP, which would permit a change to pricing any time there is State initiated change to plan specifications"], it was not considered part of its bid proposal." As (then) Judge Long explained in On-Line Games, "[o]nly after a deviation is determined to be non-material can a contract be awarded." 279 N.J. Super. at 602, 653 A.2d 1145. If this were not the case, "it would not matter what a bid contained *563 and the requirement of a non-material deviation in the RFP, the rule and the cases would be utterly meaningless. ... Any other view would turn the bidding scheme on its head." Id. at 602-03, 653 A.2d 1145.
We likewise reject as utterly unpersuasive the State's second argument, that "Optum's proposed language could also be viewed as nothing more than a restatement of the RFP language that explains that if a Plan Design change affected formulary changes (e.g., a change that 'excludes certain Brand Drugs'), that change would require the parties to negotiate an amendment" and "[a]s such it is not a reservation at all."[21] Optum echoes the State in arguing its language "simply confirms that if the Division makes certain changes to the contract, the parties will negotiate appropriate price adjustments-just as the request for proposals anticipated."
It is simply not possible to view Optum's statement that it "reserves the right to modify Financial Contracted Terms based on changes by the State in formulary or any carve out of services set forth in the Agreement, including but not limited to Specialty Pharmacy services" as only restating its right to negotiate a Contract Amendment in response to Plan Design changes as permitted by Section 5.18 and Addendum 2. (Emphasis is ours.) See Suburban Disposal, Inc. v. Twp. of Fairfield, 383 N.J. Super. 484, 491, 892 A.2d 720 (App. Div. 2006) (rejecting as "unpersuasive and disingenuous" bidder's argument "it intended 'No Bid' to mean 'included in the base bid at no additional cost'"). "Financial Contracted Terms" is defined in the RFP. It includes the Administrative Fees, Average Annual Guarantees, Specialty Drug Minimum Guaranteed Discounts, Specialty Drug Overall Effective Discount and Rebate Guarantees. It constitutes the bidder's price *564 for performing the Contract, which Section 3.7.1 obligates the winning bidder to keep in effect over the entire term.
Section 5.18 provides that in the event of a Plan Design change "the parties shall meet to discuss the change and the needed Change Orders" and, in the event of "substantial changes" to "engage in negotiations for a change to the Administrative Fee." (Emphasis is ours.) Similarly, in its response to Question 116, the State expressed its expectation that in the event of changes to the Formulary affecting Rebate Guarantees "that the Contractor and the State would discuss any needed amendments to any Financial Guarantees prior to any Plan Design change." (Emphasis is ours.) Neither Section 5.18 nor the State's response to Question 116 permits a bidder the right to change its pricing terms in the event of a Plan Design change. The State's rejection of Optum's request in Question 174 to modify the RFP to permit the Vendor *357 to "change the pricing" whenever the State made changes "to the plan specifications ... that adversely impact Vendor's compensation, cost to provide services or ability to satisfy a guarantee" puts the question beyond debate and compels our rejection of the argument that Optum's express reservation was not a deviation from the RFP.
We understand the State and Optum's desire to have us view Optum's reservation as something other than a deviation from the bid specification. As the State acknowledged at oral argument, a bidder's deviation from a price term in the solicitation is almost invariably material under a River Vale analysis.[22] On-Line Games, 279 N.J. Super. at 601-02, 653 A.2d 1145. The reason is obvious; manipulation of a price term poses one of the clearest threats to the major objective of our bidding laws "to promote the honesty and integrity of those bidding and of the system itself."
*565 Keyes Martin, 99 N.J. at 256, 491 A.2d 1236. Unlike requirements that can "be relinquished without there being any possible frustration of the policies underlying competitive bidding," waiving a price term is plainly "capable of becoming a vehicle for corruption or favoritism, or ... of encouraging improvidence or extravagance, or likely to affect the amount of any bid or to influence any potential bidder to refrain from bidding, or ... of affecting the ability of the contracting unit to make bid comparisons," and is thus generally regarded as "the kind of condition[ ] which may not under any circumstances be waived." Terminal Constr. Corp. v. Atl. Cty. Sewerage Auth., 67 N.J. 403, 412, 341 A.2d 327 (1975).
Optum's reservation of the right to modify its pricing based on Plan Design changes to the Formulary or the "carving out" of certain PBM services included in the Contract, not limited to those for Specialty Pharmacy, is undoubtedly material if we are to give effect to Section 3.7.1A, which requires the winning bidder to hold its pricing for the entire Contract period, and Section 5.4A of the State Standard Terms and Conditions, which permits the State sole discretion to reduce the scope of the work and, ultimately, impose a corresponding adjusted contract price. Applying the two-part River Vale test, Optum's reservation of the right to change its pricing in response to Plan Design changes both deprived the State of the assurance the Contract would be entered into and performed according to the specified requirements of Section 3.7.1A and Standard Term 5.4A, and adversely affected competitive bidding by allowing Optum to bid with a pricing privilege not provided to other bidders.
The hallmark of this staggeringly large Contract is its anticipated Design Changes. Potential bidders were warned of it in the very first section of the Solicitation. The questions potential bidders posed to Section 5.18, as well as to Section 3.1.4 relating to Specialty Pharmacy, made clear they understood the financial risks to them such Plan Design changes entailed. The State's answers made equally clear that it was insisting on the express terms of Section 5.18 as it related to the Administrative Fee and, *566 although committing itself to working with the Vendor to preserve "existing financial terms" in the event it carved out certain Specialty Pharmacy services under Section 3.1.4C, would not permit a bidder to otherwise change its prices in response to Plan Design changes, agreeing only to "discuss" "any needed amendments *358 to any Financial Guarantees prior to any Plan Design change." See State's response to Questions 29, 116, 144 and 174.
If Optum were to insist on its right to change its pricing in the face of anticipated Plan Design changes to the Formulary or any reduction in the scope of work, the State must either avoid such Plan Design changes or risk price increases or Optum's refusal to perform, any of which would deprive the State of the assurance the contract will be entered into and performed according to the specified requirements. River Vale, 127 N.J. Super. at 216, 316 A.2d 737. In insisting its rebuffed request in Question 174 to be permitted to "change the pricing ... any time State initiated changes are made to the ... formulary" was different from the "limited clarifying language" in its bid "reserv[ing] the right to modify Financial Contracted Terms based on changes by the State in formulary," Optum asserts "it would make no sense for an offeror to state in its proposal that it intended to do something that the Division specifically rejected-doing so would risk tanking the entire proposal."
We agree. Although we cannot speculate as to why Optum determined it needed the proviso in its bid if all it meant to say was that it agreed with the specifications exactly as written, it is impossible to ignore that adding the language gave it "the option, after all bids were opened, to decline the contract" in the event the State continued to insist that Optum hold its prices in response to changes in the Formulary, at least those not significant enough to trigger an automatic price adjustment under Section 4.4.5.2, and submit to the Director's decision on an adjusted Contract price in the event of a reduction in the scope of the work, including but not limited to a carve out of Specialty Pharmacy services, under Section 5.4 of the Standard Terms. See *567 Suburban Disposal, 383 N.J. Super. at 493, 892 A.2d 720. The ability to abandon a proposal after bid opening because the bidder's offer differed from the bid specifications undermines the stability of the public bidding process, classifying the deviation as a substantial and hence nonwaivable irregularity. Meadowbrook Carting, 138 N.J. at 315, 321, 650 A.2d 748.
Optum's additional language also provided it a clear competitive advantage over the other potential bidders by permitting it to offer price terms while reserving the right to change them in the event of anticipated Plan Design changes to the Formulary or any reduction in the scope of work, including but not limited to Specialty Pharmacy services. Plan Design changes "not contemplated by" the RFP obviously posed a significant risk to potential bidders in this procurement. Although Section 4.4.5.2 permits the Vendor to adjust its pricing to return it to its "contracted economic condition" in the event Plan Design changes result in a ten percent or greater reduction in Rebates earned, the size of this Contract would suggest that Plan Design changes resulting in less than a ten percent reduction could still have a substantial effect on a PBM's profits.
Similarly, although the State committed itself in the question and answer period to work with the Vendor to preserve the existing financial terms of the Contract in the event it chose to carve out certain Specialty Drugs to allow dispensing at a Retail Pharmacy, it refused a request to modify the term of the RFP permitting the State to, ultimately, unilaterally impose an adjusted Contract price in the event it reduced the scope of the work. Plan Design changes to the Formulary or reduction in the scope of work not only threaten the Vendor's revenues, they could expose it to Liquidated Damages for failure *359 to timely pay the Rebate Guarantees required by the Contract.
Optum's additional language "reserv[ing] the right to modify Financial Contracted Terms based on changes by the State in formulary or any carve out of services set forth in the Agreement, including but not limited to Specialty Pharmacy services," permitted *568 it to "hedge" its bid, thereby reducing its financial risk from adverse Plan Design changes. That set it apart from the other bidders who agreed to be bound by all of the terms of the Bid Solicitation. See Weidner, 372 N.J. Super. at 325, 858 A.2d 560.
As the Supreme Court explained over sixty years ago, "[e]very element which enters into the competitive scheme should be required equally for all and should not be left to the volition of the individual aspirant to follow or to disregard and thus to estimate his bid on a basis different from that afforded the other contenders." Hillside v. Sternin, 25 N.J. 317, 322, 136 A.2d 265 (1957). Although it is impossible to know whether Optum based its second round bid pricing on its reservation to Section 5.18, it is worth noting Truveris' assessment that Optum's second round bid exhibited "[s]ignificant improvements coming from both improved ingredient cost discounts and improved rebates."
As explained in On-Line Games, it does not matter whether a bidder's deviation from a pricing term actually affected the bidding: "[o]mission of a cost item can be material even if it is unlikely that it could have affected the relative positions of the bidders, because it necessarily undermines the common standard of competition." 279 N.J. Super. at 601-02, 653 A.2d 1145. The inability to protect against the effect of anticipated Plan Design changes to the Formulary or any reduction in the scope of work, including but not limited to Specialty Pharmacy services, may have resulted in the higher bids of Express Scripts and Caremark or deterred other potential bidders from bidding at all.
Optum's refusal to hold its pricing in the event of changes to the Formulary not significant enough to trigger an automatic price adjustment under Section 4.4.5.2, or any reduction in the scope of work meant it did not obligate itself to perform the work in accordance with the Solicitation and permitted it to avoid a risk to which other bidders, actual or potential, had to commit themselves. Regardless of whether it actually affected the bidding, that compromised the competitive bidding process and rendered Optum's bid nonconforming.
*569 Hall Constr. Co. v. N.J. Sports & Exposition Auth., 295 N.J. Super. 629, 638, 685 A.2d 983 (App. Div. 1996).
At oral argument of the appeal and of reconsideration of our sua sponte stay, the State raised a third argument that even if we found Optum's reservation to be a deviation from the RFP, it was not material because Optum's additional language was a very close "synthesis" of the Solicitation's treatment of Plan Design changes affecting Formulary and any State reduction in the scope of the work, including but not limited to Specialty Pharmacy Services.[23]
*360 In On-line Games, Judge Long explained that even though "a literal answer" to whether waiver of a specific RFP requirement would deprive the State of assurance that the contract would be entered into and performed according to its specified requirements "would be no. ... the test seems to be more flexible than that and allows the Treasurer to evaluate the entire RFP and determine the overall importance of the omission to it as a whole."
*570 279 N.J. Super. at 600, 653 A.2d 1145 ; see also Barrick, 218 N.J. at 262-63, 94 A.3d 895 (reviewing the Director's application of that more flexible test).
Accordingly, even though the Acting Director never undertook this analysis, we nevertheless have considered the State's argument-that Optum's additional language in response to Section 5.18 was so close a synthesis of the various sections of the RFP in which the State addressed the effect of Plan Design changes on the "bigger price drivers" of the Contract, that is, those beyond the Administrative Fee addressed in Section 5.18, that the deviation was not material.[24] Having done so, we conclude it cannot withstand close scrutiny.
Preliminarily, we note the State never attempted to catalogue those provisions of the RFP it claims Optum was synthesizing in "reserv[ing] the right to modify Financial Contracted Terms based on changes by the State in formulary or any carve out of services set forth in the Agreement, including but not limited to Specialty Pharmacy services." Its argument to us was more general than specific. The State claimed Optum's additional language pulled together the different provisions of the RFP in which the State discussed the effect of Plan Design changes on pricing terms, such as Section 4.4.5.2 and the responses to the questions posed to Section 5.18, using the "language of the Contract."
The State argued because Optum employed the language of the Contract, its reservation of the right "to modify Financial Contracted Terms" had to be understood in the context of Section 5.4, the provision governing Change Orders, even though "modify" is *571 not a defined term and Optum nowhere referred to Section 5.4 in its additional language in response to Section 5.18. Because Section 5.4 provides that "[a]ny changes or modifications to the terms of this Blanket P.O. {Contract} *361 shall be valid only when they have been reduced to writing and signed by the Vendor {Contractor} and the Director," the State contends Optum was not reserving a "unilateral right" to change the pricing in response to Plan Design changes, as alleged by Express Scripts.
Instead, the State argued, Optum was only reserving the right to negotiate the various components of its pricing in accordance with Section 5.4 (with the exception of its Administrative Fee, any change to which Optum agreed was controlled by the procedure set forth in Section 5.18), "based on changes by the State in formulary or any carve out of services set forth in the Agreement, including but not limited to Specialty Pharmacy services." Because the RFP contemplates the parties entering into a negotiated Change Order in response to Plan Design changes, the State argued, Optum's language, while not a precise match of that of the RFP, and thus strictly speaking a deviation, was not materially different and certainly not so different as to cause rejection of its bid under River Vale.
We have rejected already the argument that Optum's additional language "reserv[ing] the right to modify Financial Contracted Terms" could sensibly be read to mean that Optum was merely reserving the right to ask the State to enter into a Contract Amendment in the event it made changes to the Formulary or opted to reduce the scope of the work under the Contract. Even were we to accept that Optum was only reserving the right to negotiate a change to its pricing in those circumstances, the State's "synthesis" argument still fails.
The problem is, as we read the Bid Solicitation, the Vendor's opportunity to amend the Contract in response to Plan Design changes to the Formulary or "any carve out of services set forth in the Agreement, including but not limited to Specialty Pharmacy services," is limited. Moreover, in some instances a Plan Design *572 change would appear to permit the Vendor to adjust its price without consent of the State and in others to permit the State to ultimately impose a price change without consent of the Vendor, as Section 5.18 permits it to do with regard to the Administrative Fee. In neither circumstance does the Bid Solicitation require a Contract Amendment executed by both parties.
For example, although Section 4.4.5.2 generally prohibits the Vendor from making "any modification or adjustment" to the pricing set forth in its bid "without the prior written consent of the State," it permits an exception when a Plan Design change has had "a material negative impact on Rebates earned," defined as a ten percent or greater reduction (a "Pricing Adjustment Trigger"). In that case, the Vendor may make an adjustment in its prices "as solely necessary to return PBM to its contracted economic position" before the Plan Design change, without a negotiated Change Order. Section 4.4.5.2, however, does not suggest any right in the Vendor to modify its pricing in response to a Plan Design change not resulting in a Pricing Adjustment Trigger.[25]
Regarding the carve out of services, Section 5.18 of the Bid Solicitation and Section 5.4 of the State Standard Terms and Conditions, "State's Option to Reduce Scope of Work," make clear the State retains *362 the sole discretion to reduce the scope of work under the Contract at any time, whether or not in response to a Plan Design change. Although the State committed to working with the Vendor to preserve "the existing financial terms" of the Contract in the event it "chooses to carve out certain Specialty Drugs to allow dispensing at a Retail Pharmacy" in response to Questions 29 and 144 regarding Section 3.1.4C, "Scope of Work," *573 "Specialty Pharmacy," it refused to delete the last sentence of Section 5.4A, which permits the Director to impose an adjusted contract price reflective of the reduced scope of work in the event the parties cannot negotiate one. See the State's response to Question 177. Optum's language "reserv[ing] the right to modify Financial Contracted Terms based on ... any carve out of services" fails to acknowledge the State's ability to impose an adjusted contract price in those circumstances without resort to a signed Change Order.
Accordingly, we fail to see how Optum's additional language is a "synthesis" of the Solicitation's several different provisions addressing the Vendor's ability to modify its pricing in response to anticipated Plan Design changes. The language is broader than Section 4.4.5.2 and does not acknowledge the State's ability to impose a price change under Section 5.4 of the State's Standard Terms when it reduces the scope of the work, even when the State agrees to work with the Vendor to preserve "the existing financial terms" as it has committed to do in the event it carves out certain Specialty Drugs to allow dispensing at a Retail Pharmacy in accordance with Section 3.1.4C.
The failure of Optum's additional language to acknowledge the State's right to impose an adjusted contract price when it reduces the scope of the work under Section 5.4 of the Standard Terms is underscored by Optum's agreement with Section 5.18 "as it applies to changes that impact administrative fees," while "reserv[ing] the right to modify Financial Contracted Terms based on ... any carve out of services." As the RFP permits the State to impose new pricing in either circumstance in the event negotiations with the Vendor are unsuccessful, Optum's language would thus appear to constitute a clear exception to the State's right to impose a new price for a reduced scope of work under Section 5.4 of the Standard Terms and not a "synthesis" of the two provisions.
As we noted, the Acting Director did not evaluate the entire RFP in an attempt to determine the significance of Optum's additional language to the RFP as a whole as part of a bid *574 conformity analysis. See On-Line Games, 279 N.J. Super. at 600, 653 A.2d 1145 ; Barrick, 218 N.J. at 262-63, 94 A.3d 895. He never undertook a bid conformity analysis because he determined he could simply disregard the language. That would have ordinarily resulted in our ordering a remand to the Acting Director to evaluate Optum's bid under the proper standard. See On-Line Games, 279 N.J. Super. at 601, 653 A.2d 1145. We find no reason to do so here.
Having considered the State's proffer of an alternative basis for sustaining the award, albeit one not briefed, we conclude the State's "synthesis" argument does not change our conclusion that Optum's additional language constituted a material deviation from a non-waivable term of the RFP. Moreover, the review of the Solicitation it required has not only convinced us the Division could not under any circumstances accept Optum's bid without impairment of the principles underlying public bidding, but also informed our thoughts about the appropriate remedy.
*363 The Remedy
The State and Optum argue Express Scripts' failure to appeal from our July 2017 denial of its request for stay and Optum's having already begun performance of a contract projected to save the State $1.6 billion dollars moot this appeal. We disagree. As detailed here, this was an extremely expedited and complex procurement. Both the State and Optum opposed the stay last July, claiming Optum needed to seek Medicare Part D plan approval by the Centers for Medicare and Medicaid Services, prepare for open enrollment beginning October 1 and be in a position to perform on January 1, 2018, and that a stay would derail those efforts.
When we entered our sua sponte stay after argument on December 21 based on our revised assessment of Express Scripts' likelihood of success on the merits, the State and Optum contended Medicare Part D approval having already been secured and open enrollment completed, a stay at that point would cause extreme disruption. Although we came to agree they were correct, *575 neither the size and complexity of the Contract nor the failure to have stayed its award makes this procurement unreviewable.
As the Supreme Court wrote over sixty years ago, "all bids must comply with the terms imposed, and any material departure therefrom invalidates a nonconforming bid as well as any contract based upon it. If this were not the rule, the mandate for equality among bidders would be illusory and the advantages of competition would be lost." Hillside, 25 N.J. at 323, 136 A.2d 265. We continue to adhere to this principle regardless of how expedited the procurement, the size or complexity of the contract or its projected savings to the State. Unlike the unsuccessful bidder in Barrick, we cannot find Express Scripts sat on its rights, and the equities are not against provision of relief on the merits; indeed the opposite is true. 218 N.J. at 263, 94 A.3d 895. Here, it was Optum that proceeded at its own risk in light of the significant, challenged deviation in its bid.
By agreeing with Section 5.18 as it applied to Administrative Fees, but reserving the right to modify the remainder of its bid pricing based on changes to the "formulary or any carve out of services set forth in the Agreement, including but not limited to Specialty Pharmacy services," Optum improperly hedged its bid to shield itself against anticipated Plan Design changes. That invalidated its bid and the contract award on which that bid was based.
Further, the Division's subsequent defense of that language in this appeal as consistent with the Solicitation, after having rejected a nearly identical, albeit broader, proposed reservation by Optum in the question and answer period, the Solicitation's different and conflicting references to the effect of Plan Design changes on the Vendor's pricing, and the State's changing assessment of whether it can impose pricing terms under the Contract in the event the parties are unable to negotiate new pricing following a Plan Design change,[26] convince us the Contract must be rebid.[27]
*364 *576 Our Supreme Court has expressed on many occasions the critical importance to public bidding of definite and precise specifications. See George Harms Constr. Co. v. N.J. Tpk. Auth., 137 N.J. 8, 36-37, 644 A.2d 76 (1994). Here, one of the most critical provisions on the effect of Plan Design changes on pricing, Section 4.4.5.2, is in a Section entitled, "Price Sheets/Schedule Attachment Instructions." The provision, which permits the Vendor to modify its pricing without the prior consent of the State in the event of a *577 materially adverse Plan Design change, is at odds with Section 5.4, which provides no changes or modifications can be made to the Contract unless signed by both parties. Section 4.4.5.2 is not referenced in Section 5.18, the Section potential bidders were advised in Section 1.1 would control changes to the Contract in the event of Plan Design changes, and the State did not refer potential bidders concerned about Plan Design changes on their pricing to the section in the question and answer period. Although the necessity of definite and precise specifications is critical for any procurement, it is even more imperative in this procurement in light of anticipated Plan Design changes, which, because of the composition of the Plan Design Committees, are beyond the State's control.
Notwithstanding our conclusion that Optum's bid was nonconforming and its Contract invalid, and that it is solely responsible for the nonconforming language in its bid, particularly in light of the proposed reservation the Division rejected during the question and answer period, the same disruption to the prescription plans which caused us to reconsider our stay of the Contract prevents us from ordering Optum's removal during the rebid.
Although the absence of a stay has presumably permitted the State to secure the first-year savings in the SHBP/SEHBP the procurement promised, no savings can justify the impairment to the integrity of the bidding process caused by an irregular proceeding. See *365 On-Line Games, 279 N.J. Super. at 603, 653 A.2d 1145. Accordingly, the Division must proceed to rebid the Contract as expeditiously as possible. Whether that can occur in sufficient time to allow the Vendor to prepare for open enrollment next October is a matter we leave to the Acting Director.
Reversed and remanded for further proceeding not inconsistent with this opinion. We do not retain jurisdiction.

The Solicitation defines this as a pharmacy or pharmacy network "that offers an 84-90 day supply of medications for chronic conditions also known as maintenance medications."

Specialty drugs are defined as injectable and non-injectable drugs costing in excess of $670 per 30 days' supply and requiring frequent dosing adjustments and intensive clinical monitoring or patient training and compliance assistance or having limited availability or specialized handling or administration requirements.

Ingredient Cost Discounts are defined as the percentage difference between the applicable average wholesale price for a covered medication and the amount paid by the PBM to the pharmacy less any dispensing fee, copayment or sales tax.

Administrative Fee is defined as:
An all-inclusive monthly fee for Pharmacy Benefit Management (PBM) Services paid by the State to the Vendor {Contractor} comprised of all direct and indirect costs including, but not limited to: Program fees, Claims administration, labor costs, overhead, fee or profit, clerical support, travel expenses, per diem, safety equipment, materials, supplies, managerial support and all documents, forms, reports, and reproductions thereof. The Vendor's {Contractor's} monthly compensation is a function of the Administrative Fee multiplied by the number of participating public employees/retirees. ...

Rebates are defined as:
All concurrent, past and future revenue/financial remuneration and credits received by the Vendor {Contractor} from outside sources attributed to, directly or indirectly, the utilization of the SHBP/SEHBP or enrollment in SHBP/SEHBP Programs. ... regardless of how such benefits are otherwise characterized by Vendor {Contractor} and relevant third parties.

Pharmacy Benefit Management Services are defined as:
Claims processing, eligibility verification, all contracting and management and administration of contracts with Participating Pharmacies and/or Pharmaceutical Manufacturers, Formulary and clinical support, and all other services described in this Bid Solicitation {RFP} or performed by Vendor {Contractor} as a result of this Contract.

The Financial Guarantees consist of the Vendor's guaranteed pricing for each item listed in the Bid Solicitation Section 3.8.1; the amount of Rebates the Vendor guarantees are paid to the Division of Pensions and Benefits; the overall Ingredient Cost Discount applied to all Specialty Drugs and the drug-specific pricing guaranteed for each Specialty Drug by National Drug Code. And the Specialty Drug Overall Effective Discount is the overall Ingredient Cost Discount that applies to all Specialty Drugs.

The Bid Solicitation notes it is administered through NJSTART, the State's "eProcurement portal," and that "[t]erminology is listed by new NJSTART term; {existing term} appears in braces."

Section 2.3 of the Bid Solicitation defines "Plan Design(s)" as "[t]he Formulary, Copayments or Coinsurance, Deductibles, Programs and Program protocols, Quantity Limits, Claims processing variables and other matters identified in a separate Benefit Specification Form for each Plan, and where applicable, for separate groups within each Plan."

The State of New Jersey Standard Terms and Conditions are included as Section 9 of the Bid Solicitation.

"Financial Contracted Terms" is defined in the Bid Solicitation as "[t]he (i) Administrative Fees; (ii) Average Annual Guarantees; (iii) Specialty Drug Minimum Guaranteed Discounts; (iv) Specialty Drug Overall Effective Discount, and (v) Rebate Guarantees."

Program is defined as "[a]ny Pharmacy Benefit Management Program that a Plan chooses to implement ... based on specified protocols provided to the Vendor ... including but not limited to a: Prior Authorization Program, Step Therapy Program, Mandatory Generic Program, or Quantity Limit Program."

The State explained at oral argument that a Plan Design change that excluded certainly heavily rebated drugs from the Formulary could impact the PBM's ability to meet its Guarantees by skewing its averages over a given class of drugs.

In contrast, the State responded to Question 117, asking whether the State would agree to negotiate pricing terms in response to regulatory changes or marketplace events that could similarly affect the PBM's ability to "achieve the guarantees," by referring potential bidders to Section 5.5 of the Standard Terms and Conditions, "Change in Law," which permits the Director final say over whether any change will result in a price adjustment to the Vendor and RFP Section 3.7.1H "General Financial," in which the State commits to negotiating a Contract Amendment in the event of marketplace changes to allow the parties to "maintain the same financial relationship."

Section 3.1.4C, "Scope of Work," "Specialty Pharmacy" permits the Division of Pension and Benefits to "establish certain Specialty Drug protocols" to be implemented in any or all of its Plans, including
C. A requirement that the Vendor {Contractor} adjudicate, but not dispense, certain Specialty Drugs, which shall instead be dispensed from an alternative designated third party Specialty Drug pharmacy if the State carves out said Specialty Drug(s) from the Vendor's {Contractor's} dispensing responsibilities.

Section 5.4 of the Standard Terms provides:
The State has the option, in its sole discretion, to reduce the scope of work for any deliverable, task or subtask called for under this contract. In such an event, the Director shall provide to the contractor advance written notice of the change in scope of work and what the Director believes should be the corresponding adjusted contract price. Within five (5) business days of receipt of such written notice, if either is applicable:
A. If the contractor does not agree with the Director's proposed adjusted contract price, the contractor shall submit to the Director any additional information that the contractor believes impacts the adjusted contract price with a request that the Director reconsider the proposed adjusted contract price. The parties shall negotiate the adjusted contract price. If the parties are unable to agree on an adjusted contract price, the Director shall make a prompt decision taking all such information into account, and shall notify the contractor of the final adjusted contract price; and
B. If the contractor has undertaken any work effort ... that is being changed or eliminated such that it would not be compensated under the adjusted contract, the contractor shall be compensated for such work effort according to the applicable portions of its price schedule and the contractor shall submit to the Director an itemization of the work effort .... The Director shall make a prompt decision taking all such information into account, and shall notify the contractor of the compensation to be paid for such work effort.

Section 5.1 provides:
This Blanket P.O. {Contract} awarded, and the entire agreement between the parties, as a result of this Bid Solicitation {RFP} shall consist of this Bid Solicitation {RFP}, [State of New Jersey Standard Terms and Conditions], Bid Amendment {Addendum} to this Bid Solicitation {RFP}, the Vendor's {Contractor's} Quote {Proposal}, any Best and Final Offer, and the Division's Notice of Award.
In the event of a conflict in the terms and conditions among the documents comprising this Blanket P.O. {Contract}, the order of precedence, for purposes of interpretation thereof, listed from highest ranking to lowest ranking, shall be:
A. Executed Offer and Acceptance Page {Signatory Page};
B. Bid Solicitation {RFP} Section 5, as may be amended by Bid Amendment {Addendum};
C. The State of NJ Standard Terms and Conditions (SSTC) accompanying this Bid Solicitation {RFP};
D. All remaining sections of the Bid Solicitation {RFP}, as may be amended by Bid Amendment {Addendum};
E. The Vendor's {Contractor's} final submitted Best and Final Offer; and
F. The Vendor's {Contractor's} Quote {Proposal} as accepted by the State.

Crowe v. De Gioia, 90 N.J. 126, 132-34, 447 A.2d 173 (1982).

The State advised at oral argument that the Evaluation Committee, which completed its review of these bids within twenty-four hours, reviewed only the documents the bidders submitted with their proposals and did not look at the draft plans bidders had available at their facilities. Review of the draft plans appears to have been a casualty of the extremely expedited nature of this procurement. Although that fact is certainly concerning given the nature of the services and size and scope of the project, it provides no basis to reverse the bid award.

Section 6.1 provides that "[t]he Director reserves the right to waive minor irregularities or omissions in a Quote{Proposal}. The Director also reserves the right to waive a requirement provided that the requirement does not materially affect the procurement or the State's interests associated with the procurement." (Emphasis is ours.)

It is not lost on us that this argument directly contradicts the Acting Director's finding that "Optum's proposed revision was addressed and rejected during the Question and Answer Period." Plainly the Acting Director perceived no discernible difference between Optum's "proposed language" and the modification to the specifications it requested in Question 174.

The only exceptions being generally for clerical errors or "an error so obvious that the true intent of the bidder was clear beyond any doubt." Spina Asphalt Paving v. Borough of Fairview, 304 N.J. Super. 425, 430, 701 A.2d 441 (App. Div. 1997).

We are aware the State subsequently made a different argument to the Supreme Court in opposition to Express Scripts' request for emergent relief reversing our December 26, 2017 order lifting the post-argument stay of the contract award. In the Supreme Court, the State contended the Division's answers to the bid questions transformed Section 5.18 from "initially a provision solely about modifying administrative fees" to "a provision addressing changes to the administrative fee and to the more sensitive financial terms." The State further asserted that changes "the State may make in formulary or specialty pharmacy ... would have to be made by the [Plan Design Committees], under [their] Chapter 78 authority, and thus would be changes in law and subject to that contract provision." Based on those two, somewhat dubious, contentions, the State argued Optum's reservation of the right to "modify Financial Contracted Terms," "understood as it is used in the RFP .... as amendments ... in writing and agreed by both parties," "[t]o the extent ... it does not entirely comport with back and forth submissions in the Change in Law provision, such difference in the nature of the written exchanges does not deprive the State of the ability to make a Change in Law adjustment to the contract."
The parties provided us their briefs to the Court as a courtesy only. Because the State made entirely different arguments to us, we do not address this new argument further. We note only that its foundation, particularly as it relates to Plan Design changes constituting a change in law, does not appear sound, and the argument does not alter our conclusion that an immateriality finding was impossible on this record.

Optum has not argued it was attempting to "synthesize" the various sections of the RFP in which the State addressed the effect of Plan Design changes on pricing. Indeed, nowhere in Optum's brief does it ever make reference to Section 4.4.5.2. Optum's argument is that "in both the RFP and in the clarifying Q & As, the Division directed that where it made significant changes to the plan following award, the contractor would have an opportunity to renegotiate its pricing to account for those changes" and that its "proposal did nothing more than reaffirm OptumRx's right to enter into those negotiations, consistent with § 5.18."

Express Scripts argued to the Acting Director that a Plan Design change to the Formulary having "a less than 10% impact on rebates" provides "the Vendor no right to an adjustment under the RFP," and that Optum's exception gave it "free [rein] to adjust the rebate guarantee downward, harming the State in its ability to select a formulary to best serve its needs" and "the level playing field of the bidders."

When we put this question to counsel at oral argument on the appeal, counsel for both Express Scripts and the State agreed the State could not impose new pricing in response to a Design Change and instead would be forced to terminate the Contract. At oral argument on reconsideration of our stay a week later, the State argued it could impose terms under Section 5.5 of the State Standard Terms pursuant to Section 5.18 as it relates to the Administrative Fee. As we explained in n. 22, following that argument, the State argued to the Supreme Court that it could impose terms following Plan Design changes because the Plan Design Committees would be operating "under [their] Chapter 78 authority, and thus would be changes in law and subject to that contract provision." The State cited no law in support of that assertion, and we have already expressed our doubts as to its validity.

Although we suggest no impropriety, we find particularly concerning the Acting Director's statement in the final agency decision that "[w]ith the posting of Bid Amendment {Addendum} # 2, all potential Bidders were advised that State fully expects to negotiate all pricing and financial guarantees prior to implementation of any plan design changes." (Emphasis is ours.) That statement is presumably based on the Division's answer to Question 117, in which the State expressed its expectation that in the event it excluded certain Brand Drugs from the Formulary, it "would discuss any needed amendments to any Financial Guarantees," echoing the statement in Section 5.18 that in the event of a Plan Design change, "the parties shall meet to discuss the change and discuss the needed change orders." As we have noted, the State refused any modification to Section 5.18 in Addendum 2, which plainly states "there shall be no change in the Administrative Fee" when Plan Design changes require only changes in the Vendor's claim administration and related systems or a change to an open enrollment period or additional communications with Network Providers or reissuance of Identification Cards to members and is silent as to the remaining price components. Accordingly, even leaving aside the negative implication of Section 4.4.5.2 as restricting adjustments to the remaining price components from Plan Design changes to those causing a Pricing Adjustment Trigger, the Acting Director's statement would appear, at best, overbroad, but could, at worst, appear as acquiescing in Optum's additional language "reserv[ing] the right to modify Financial Contracted Terms based on changes by the State in formulary or any carve out of services set forth in the Agreement, including but not limited to Specialty Pharmacy services."